IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

SUE FERGUSON DAVIS,
    Plaintiff,
    v.                                                       2:11-cv-00879

BAYER, AG,
BAYER CROPSCIENCE, AG,
BAYER CROPSCIENCE HOLDING, INC., and
BAYER CROPSCIENCE, LP,

and

WEST VIRGINIA PAVING, INC.

and

ADISSEO MANUFACTURING, INC. and
ADISSEO USA, INC.,
    Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO STRIKE**

For her Response in Opposition to the Motion to Strike in this proceeding, Plaintiff Sue Ferguson Davis, by her Counsel, states as follows:

I.    Preliminary Matter

On November 28, 2011, Plaintiff filed a motion to remand this proceeding to the Circuit Court of Kanawha County, West Virginia based upon the lack of unanimity among defendants and the absence of a plausible claim of fraudulent joinder. If granted, this Court will no longer have jurisdiction over this proceeding. Elementary concerns for judicial economy suggest that this Court resolve the jurisdictional issue prior to addressing the motion to strike. Additionally, should the Court deny the motion for remand, Plaintiff respectfully requests that the Court defer ruling on the motion to strike

for an additional 10 days to permit Plaintiff to perfect an appeal from such a ruling to the U.S. Court of Appeals for the Fourth Circuit under 28 U.S.C. § 1453 (c)(1).[1]

## II. Relevant Authorities

Rule 12 (f), Fed. R. Civ. P., entitled "Motion to Strike," provides in its entirety as follows:

> The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act: (1) on its own; or (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Rule 12, Fed. R. Civ. P.

Interpreting Rule 12(f), Professor Moore has stated:

> "Motions to strike allegedly redundant, immaterial, impertinent or scandalous matter are not favored (citation omitted). **Matter will not be stricken from a pleading unless it is clear that it can have no possible bearing upon the subject matter of the litigation**. If there is any doubt as to whether **under any contingency** the matter may raise an issue, the motion should be denied."

2A MOORE's *Federal Practice* 12.21[2] (2nd ed. 1985)(emphasis added).

It appears that no decision of the United States Supreme Court, or of the United States Court of Appeals for the Fourth Circuit, has addressed the criteria to be applied to a Rule 12 (f) motion to strike.

---

[1] 28 U.S.C. § 1453 (c)(1), entitled "Review of Remand Orders," provides in pertinent part that: "…a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not more than 10 days after entry of the order."

Although formulated with different language, the criteria identified by Professor Moore is not materially different from the formulation cited by Defendants, See *5C Charles Alan Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, Federal Practice & Procedure* § 1382 (3d ed. 1989), and both authorities have been followed by the U. S. Courts of Appeal to consider the matter. Entergy Nuclear Fitzpatrick LLC v. The United States (C.C., 2010) ("the court must 'construe the pleadings liberally to give the defendant a full opportunity to support its claims at trial'"), Craig Funeral Home v. State Farm Mutual Auto. Ins. Co., 254 F.2d 569 (5th. Cir., 1958)("a plaintiff is entitled to have his case tried on the proofs rather than the pleadings unless it appears to a certainty that he would be entitled to no relief under any state of facts which could be proved in support of his claim"), Stanbury Law Firm v. Internal Revenue Service, 221 F.3d 1059 (8th Cir., 2000)(" striking a party's pleadings is an extreme measure, and, as a result, we have previously held that "[m]otions to strike under Fed.R.Civ.P. 12(f) are viewed with disfavor and are infrequently granted").

An assessment that a pleading is immaterial, impertinent or scandalous requires an examination of the causes of action alleged and the evidentiary showing required of a plaintiff with respect to each cause of action.

### III.     Causes of Action

Plaintiff's Complaint states causes of action for negligence, strict liability, nuisance (public and private), battery and medical monitoring.  There are specific factual allegation relating to a release of toxic gases between October 13, 2009 and October 25, 2009, and more general allegations not tied to a specific or individual chemical release.

Negligence

The core elements of a cause of action for negligence are: (1) the existence of a duty of due care on the part of the defendant toward the plaintiff, (2) a breach of that duty, (3) injury to the plaintiff, and (4) a causal nexus between the plaintiff's injury and the defendant's negligence.

Strict Liability

In *Peneschi v. National Steel Corp.,* 295 S.E.2d 1, 170 W.Va. 511 (W.Va., 1982), the West Virginia Supreme Court of Appeals adopted the rule of strict liability for inherently dangerous activities – eliminating the requirement that a plaintiff show the defendant was negligent -- as that rule was articulated in the Restatement (Second) of Torts. The Restatement (Second) of Torts, § 519 (1976), balances six factors in determining whether an activity falls within the "abnormally dangerous" category, triggering strict liability:

>	(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
>
>	(b) likelihood that the harm that results from it will be great;
>
>	(c) inability to eliminate the risk by the exercise of reasonable care;
>
>	(d) extent to which the activity is not a matter of common usage;
>
>	(e) inappropriateness of the activity to the place where it is carried on; and
>
>	(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement (Second) of Torts, § 520 (1976).

4

Nuisance

The law of private nuisance in West Virginia is stated in three syllabus points of *Duff v. Morgantown Energy Associates*, 421 S.E.2d 253, 187 W.Va. 712 (W.Va., 1992) as follows:

> 1. "A private nuisance is a substantial and unreasonable interference with the private use and enjoyment of another's land." (citation omitted.
>
> 2. " 'As a general rule, a fair test as to whether a particular use of real property constitutes a nuisance is the reasonableness or unreasonableness of the use of the property in relation to the particular locality involved, and ordinarily such a test to determine the existence of a nuisance raises a question of fact.' (citations omitted).
>
> 3. "It is a general rule that when the thing complained of is not a nuisance per se, but may or may not become so, according to circumstances, and the injury apprehended is eventual or contingent, equity will not interfere; the presumption being that a person entering into a l[e]gitimate business will conduct it in a proper way, so that it will not constitute a nuisance." (citation omitted).

421 S.E.2d 254.

*State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 200 W.Va. 221 (W.Va., 1997), defines public nuisances, for West Virginia, as acts or conditions that unlawfully operate to hurt or inconvenience an indefinite number of persons. The distinction between a public nuisance and a private nuisance is that the former affects the general public, and the latter injures one person or a limited number of persons only. 488 S.E.2d 921.

Battery

A battery based upon the release of toxic chemicals into the environment requires that a plaintiff demonstrate "actual physical impairment," and not mere fear of future injury. *Rhodes v. E.I. Du Pont Nemours and Co.,* No. 10-1166, Apr. 8, 2011 (4th Cir., 2011).

5

Medical Monitoring

The Fourth Circuit has observed that West Virginia recognize an independent tort claim for medical monitoring, which permits a plaintiff to recover the costs of diagnostic testing for diseases that may develop in the future as a result of a defendant's conduct, but require a plaintiff to prove a "significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure, i.e., a plaintiff must still prove the required elements of that tort to obtain medical monitoring relief. *Rhodes v. E.I. Du Pont Nemours and Co.,* No. 10-1166, Apr. 8, 2011 (4th Cir., 2011).

Punitive Damages

In connection with these claims, Plaintiff seeks both compensatory and punitive damages and equitable relief. Under West Virginia law, imposition of punitive damages is governed by the following criteria:

> (1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

> (2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

> (3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

    (4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

    (5) The financial position of the defendant is relevant."

18. "When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

    (1) The costs of the litigation;

    (2) Any criminal sanctions imposed on the defendant for his conduct;

    (3) Any other civil actions against the same defendant, based on the same conduct; and

    (4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

*Peters v. Rivers Edge Min., Inc.*, 680 S.E.2d 791 (W.Va., 2009).

### IV.     Matter Objected To By Defendants

The Plaintiff is required and entitled to identify clearly its adversary, and to bring to the attention of the fact finder information about the adversary that is relevant to the issues in the litigation. Where there is a claim for recklessness and punitive damages, evidence of knowledge of dangers, and of prior misconduct, are both relevant.

In the present case, even the most superficial examination of the question "Who is Bayer?" requires a short history lesson. The explanation begins with a discussion of the initial German company, rather than the U.S.-based Bayer CropScience, L.P., because it is apparent that the executives that make the critical decisions relating to Bayer's operations in the United States are not located in North Carolina; they are located in Germany.

Specifically, in the course of the litigation filed in February, 2011, styled *Maya Ney et al. v. Bayer CropScience, L.P.*, CA 2:11-cv-00087, Counsel for the North Carolina-based entity (who also represent the Defendants in this proceeding) repeatedly explained to the Court that, on controlling matters, they would have to consult with "Germany." Thus, at the hearing on March 18, 2011, Counsel for Defendants stated as follows:

> Your Honor, on Monday, Tuesday, Wednesday, and Thursday of this week, high-level meetings were being held at the headquarters of Bayer AG in Germany regarding the status and the future of the MIC unit at the Institute plant here in West Virginia.
> …
> Mr. Steven Hedrick, who is the Institute site manager for Bayer, was in Germany for those meetings.

Trans. at p.3, March 18, 2011, CA 2:11-cv-00087.

If the decision makers are in Germany, it is totally appropriate to hold them accountable for their actions in U.S. courts. A review of the web page for Bayer, A.G. is a natural beginning point for the research on the identity of the defendant – if for no other purpose than to get the address for service of process – and that web page is, in fact, the primary source for most, if not all, of the purportedly "immaterial, impertinent, or scandalous" matters objected to here.

Once one undertakes to explain the origins of Bayer in a partnership formed in the mid-19th century between two individuals – one of whom was named "Bayer" – it becomes necessary to track that entity through its various incarnations to the entity currently known as "Bayer" because the organization known as "Bayer," in German corporate parlance, was "deleted" in 1925, a fact recited on Bayer, A.G.'s web page:

8

> Once the global economy stabilized in the mid-20s, it became clear that the German dyestuffs industry would be unable to regain its old position in the world market. In order to remain competitive and gain access to new markets, the companies belonging to the community of interests decided to merge in 1925. **Bayer** transferred its assets to I.G. Farbenindustrie AG (I.G.) and **was deleted from the commercial register as a company.**
>
> Yet the Bayer tradition lived on in the I.G.'s Lower Rhine operating consortium, which consisted of the Leverkusen, Dormagen and Elberfeld sites, as well as the Uerdingen site. Leverkusen also became the headquarters for the I.G.'s pharmaceutical sales association, and the **Bayer Cross was used as the trademark for all of the I.G.'s pharmaceutical products.**

http://www.bayer.com/en/1925-1945.aspx (emphasis added)(visited December 8, 1941).

And Defendants cannot object on grounds of accuracy -- or on grounds of immateriality or otherwise -- to the explanation that Bayer is able to use the name "Bayer" in the United States today because, even though the name was confiscated following World War I, they re-obtained the name by purchasing the US firm which bought the name at auction following World War I, because these facts too are disclosed on Bayer, A.G.'s web page:

> **The company's U.S. assets, including** its patents and **trademarks, were confiscated in 1917 and auctioned off** to its competitors.

http://www.bayer.com/en/1914-1925.aspx (emphasis added)(visited December 8, 1941).

> **Bayer acquired** the North American self-medication business of **Sterling Winthrop in 1994** — **a milestone in the company's history, as the purchase also allowed the company to regain the rights to the "Bayer" company name in the United States.** For the first time in 75 years, Bayer could operate in the United States under its own name and with the Bayer Cross as its corporate logo. In

9

1995 U.S.-based Miles Inc. was renamed Bayer Corporation.

http://www.bayer.com/en/1988-1995.aspx(visited December 8, 2011).

Plainly, it is not the Byzzantine twists of its corporate organizational background to which Defendants object; they dislike having their participation in World Wars I & II recited in this litigation. In particular, they dislike the recitation of the facts relating to Bayer's participation in the Nazi state during World War II -- at least their lawyers do.

But Bayer, A.G. is the source of virtually all of that information. Specifically, among the "most" offensive allegation to which Defendants' attorneys object is the allegation in ¶ 9 of the Complaint that Bayer was "**integrated into the German war economy**" in World War I. See Motion to Strike at p. 4 (emphasis added). Bayer's attorneys suggest that the information is inaccurate and from sources with reliability on a par with the National Inquirer.

In fact, Bayer, A.G.'s web page, in a section entitled "History" with the subtitle "World War I and its consequences (1914-1925)" relates that:

> **Bayer was** increasingly **integrated into the war economy and began to produce** war materials, including explosives and **chemical weapons**.[2]

---

[2] Phosgene, among the first chemicals used in World War I as a weapon (and illegal then under international law), was produced in Institute, WV at least as late as August 2010 when Bayer claims to have last produced MIC. The fact that phosgene was banned as a weapon for use on the battle field is relevant to Plaintiff's claim of nuisance, at least through 2010. One may fairly ask how reasonable it can be to manufacture phosgene in a residential neighborhood, if it is in fact too dangerous for use in war? And Bayer's production of phosgene, and knowledge of its dangers, is relevant to the Plaintiff's allegation of fact that the chemical plant is inherently dangerous (a requirement for imposition of strict liability) and that Bayer's production of it in Institute is reckless (a predicate for punitive damages). References to phosgene cannot be fairly said to have no possible bearing on Plaintiff's claims in this litigation.

http://www.bayer.com/en/1914-1925.aspx (emphasis added)(visited December 8, 1941).

Moreover, Bayer, A.G.'s web-page makes no attempt to conceal the company's association with the Nazi regime, although they describe it by use of passive voice and omit significant details. Thus, in the portion of its web-page entitled "History – I.G. Farbenindustrie AG (1925-1945), Bayer, AG recites that:

> In 1936 the National Socialist government began systematically preparing for war. When the Second World War finally broke out in 1939, the locations of the Lower Rhine consortium were among the sites of German industry that were considered "vital to the war." Production requirements grew steadily, yet more and more employees were drafted into military service. For this reason, **foreign and forced laborers from the occupied countries of Europe were brought to work in [Farben-Bayer's] Leverkusen, Dormagen, Elberfeld and Uerdingen** - and throughout German industry as a whole - to maintain output levels. At times during the war, **these laborers accounted for up to one third of the workforce**.

http://www.bayer.com/en/1925-1945.aspx (visited December 8, 1941).

Bayer AG's web-page adds: "**Concentration camp prisoners were not employed in the Lower Rhine sites**." http://www.bayer.com/en/1925-1945.aspx (emphasis added)(visited December 8, 1941). This statement may well be true as a matter of geography, but it omits the historical fact that Farben-Bayer's major new production facility constructed during the war was located in the southwestern Polish town of Oswiecim, known to history as Auschwitz. This fact is, Plaintiff readily concedes, obtained from sources other than Bayer's web page.

According to the PBS documentary "Auschwitz: Inside the Nazi State":

> The town was situated on major railroad lines. Its surrounding area was rich in natural resources, particularly fresh water, lime, and coal. **This made it an excellent location for IG Farben**, the German industrial

11

>conglomerate, to build a factory that would manufacture war materials.

http://www.pbs.org/auschwitz/40-45/beginnings/ (visited December 8, 2011).

Further, the PBS documentary relates:

>Industrialization interested **Heinrich Himmler,** Commander of the SS. His **dream was that IG Farben's activities would fund the creation of a model Nazi settlement where Auschwitz prisoners would work as slave laborers and the SS would profit by selling coal and gravel as well as labor to IG Farben**. Toward the end of 1940, Himmler visited Auschwitz and ordered the camp tripled in capacity from 10,000 to 30,000 prisoners. Auschwitz would be a backwater no longer, it would become the largest concentration camp in the Nazi empire. Over the succeeding months and years, a series of architectural plans were drawn up, detailing even greater expansion of the Nazi vision for Auschwitz."

http://www.pbs.org/auschwitz/40-45/beginnings/1940b.html (visited December 8, 2011).



      Building plan for remodeling the train station grounds, Auschwitz. The new train station was to be at one end of a long avenue that connected it with the gate of the IG Farben factory.

http://www.pbs.org/auschwitz/maps/model7.html (visited December 8, 1947).

      Plaintiff (and its counsel) cannot be faulted on grounds of accuracy for supplementing the statement on Bayer, AG's web-page to the effect that slave labor was **_not_** used at Farben-Bayer's Lower Rhine factories, with the fact that slave labor was used, on an historically extraordinary scale, at another Farben-Bayer location outside the Lower Rhine. Nor can the topic be deemed impertinent or scandalous when it is included, albeit in a more oblique reference, on Bayer, AG's own web-page. Similarly, it

13

is not impertinent to disregard Bayer, AG's use of the phrase "foreign and forced labor" instead of the more descriptive language of the war crime trials: "slave labor."[3]

Other matters Defendants' objected to, and Plaintiff's response to the Defendants' objections, include the following:

1. Defendants object to the allegation of "Farben-Bayer's 'discovery' of heroin." Response: ¶8 of the Complaint in fact alleges that Bayer "discover[ed] aspirin and heroin." It is not clear whether the reference is challenged for accuracy, but the fact is undeniable; if that is the ground for objection it needs to be made explicit. For Rule 12 (f) purposes, the reference to both aspirin (for which Bayer is clearly best known) and heroin, is relevant because Plaintiff expects to develop evidence, potentially relevant to punitive damages, that Bayer was aware of the addictive qualities of heroin and continued to sell it for years anyway. Coupled with the selection of a convicted war criminal in the mid-1950's (not challenged as a matter of historic accuracy), it is not beyond possibility that a jury could conclude that this company simply has no regrets for its past misconduct, a finding bearing on the appropriateness of punitive damages.

2. References to Zyklon B, a pesticide used at Auschwitz, cannot be said to have no possibility of bearing on Plaintiff's claims of recklessness and punitive damages. Zyklon B is basically a cyanide gas to which a deodorant has been

---

[3] Plaintiff's recitation of the number of directors of Farben-Bayer convicted of war crimes as being 13 out of 24 is reported by the National Archives Microfile Publication M892, the official records of the Nuremburg War Crime Tribunal. See: http://www.archives.gov/research/captured-german-records/war-crimes-trials.html (visited Dec 8, 2011).

    added.  Cyanide is believed to be among the toxins released on October 13, 2009.  A jury could without reaching conclude that Bayer knew of the dangers of production of cyanide (or chemicals from which it can be generated in accidents or fires) and that their production of them at Institute, WV was reckless.

3. The references to Union Carbide's release of MIC in Bhophal, which was manufactured at least until August 2010 in Institute is, by itself, not prejudicial to Bayer, and is relevant to an assessment of the nuisance claim as it existed on October 13, 2009, at a minimum.

4. The reorganization of Bayer, A.G. into a holding company is without exception the most innocuous statement about Bayer in the entire Complaint.  What possible prejudice could flow from this mundane fact?  It is relevant however if one has any hope of completing the link between two partners in the late 19th century, and the people running Bayer today – and all intervening events.

5. "Unsubstantiated allegation" that "two citizens died of exposure to gas released" in August 2008 and "insinuation" that MIC was released.  The allegations of citizen deaths are not "unsubstantiated."  One claim pertaining to Gail Marie Ferguson's death on October 11, 2008 (barely six weeks after the August 2008 explosion) is the subject of an appeal from this Court's grant of summary judgment (on statute of limitations grounds) in *Warne Ferguson v. Bayer*, 2:11-cv-00087.  The other case is pending in the Circuit Court of Kanawha County, West Virginia and involves the death in September 2008,

less than a month after the August 2008 explosion, of Ra'Sean Gray, a student at West Virginia State University. These deaths cannot be said to be "unsubstantiated" just because Bayer denies liability; the cases (at least one of them) are likely to go to trial on the merits. Plaintiff is entitled to allege that the deaths were associated with Bayer's recklessness, and shoulder the burden of proof associated with that allegation. But the absence of a verdict of liability, in hand today, does not mean that the allegations have "no possible bearing" on Plaintiff's claims here; manifestly they do.

6. The "insinuation" of a release of MIC in the August 2008 explosion is not frivolous or "unsubstantiated." Bayer's claim that no MIC was released has been noted by the CSB report of January 2011 and dismissed because Bayer's relevant monitoring equipment was turned off. Additionally, the claim that no MIC was released is, inferentially at least, contradicted by the fact that cyanide (a derivative of MIC consumption in fire) was found in the lungs of Bayer employee Barry Withrow, who died at Institute, WV on the night of August 28, 2008. Again, it cannot be said that the allegations have no possible bearing on Plaintiff's claims.

7. Defendants object to reference to Plaintiff's assertion that this Court's February 8, 2011 temporary restraining order was based, in part, on the history of safety violations at Institute, WV. Page 43 of the February 10, 2011 transcript includes the following holding by this Court:

> Second, given the very limited record, including limited evidence of the <u>defendant's history of safety violations, alleged misrepresentations to the public, multiple accidents, chemical leaks</u>, and in light of the fact the court has not had

> the opportunity to conduct a preliminary injunction evidentiary hearing, I find that the plaintiffs are likely to suffer irreparable harm in the absence of this temporary relief.

*Maya Nye, et al v. Bayer*, CA No. 2:11-cv-00087, Feb. 10, 2011 transcript at p. 43.

Defendants' conclude that the "corporate history (whether true or not) of entities with no involvement whatsoever with the facts and circumstances surround the claims asserted by the Plaintiff add nothing to the Complaint…" Motion at p. 5.

This statement is simply false. Bayer's counsel has in open stated in public and directly to this Court as recently as March 18, 2011 – less than nine months ago – that Bayer, A.G. makes the decisions of what to manufacture and when at Institute, WV. And Bayer, A.G.'s own web page documents the continuity between the entity that created Bayer aspiring, and the company that today runs the chemical plant in Institute, WV. The fact that Bayer's counsel would prefer to forget the intervening history of that company does not make that history – recounted in no small detail on Bayer A.G.'s own web page – immaterial, impertinent or scandalous within the meaning of Rule 12 (f).

The assertion that all of these matters have no possibility of bearing on Plaintiff's claims is specious. Nor can Bayer plausibly claim that their inclusion in the Complaint itself somehow prejudices it at trial, when a full range of evidentiary tools will be available to this Court to insure a fair trial. If, after discovery and related pleading Bayer wishes to file a motion *in limine* to exclude some item of evidence from the jury, nothing in the Complaint, or this Court's ruling on Defendants' Rule 12 (f) motion forecloses consideration of such a motion *in limine*.

Bayer cannot plausibly assert that repetition in the Complaint of matters clearly a matter of public knowledge for more than half a century – by virtue of their inclusion in the Complaint alone – somehow deprives them of a fair trial. Will they assert at trial that the presence in the jury venire of anyone with a passing knowledge of the Nuremburg trials may be stricken for cause?

Plaintiff respectfully submits that the allegations complained of cannot be fairly described as having no possible bearing on the claims stated in the Complaint, and that the Defendants' motion to strike should be denied.

Respectfully submitted,

**SUE FERGUSON DAVIS**

By Counsel

/s/William V. DePaulo
William V. DePaulo, Esq. #995
179 Summers Street, Suite 232
Charleston, WV 25301
Tel: 304-342-5588
Fax: 304-342-5505
william.depaulo@gmail.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiff's Response in Opposition to Motion to Strike was filed this 8th day of December, 2011 with the Clerk of the United States District Court for the Southern District of West Virginia by use of the CM/ECF electronic filing system and thereby served on the following counsel for all other parties:

Thomas J. Hurney, Esq. #1833
Michael M. Fisher, Esq. #4353
Ryan E. Voelker, Esq. #11159
JACKSON KELLY PLLC
500 Lee Street, E., Suite 1600
P O Box 553
Charleston, WV 25322
Tel: 304-340-1000
*Counsel for Bayer CropScience, LP,*
*Bayer CropScience Holding, Inc.,*
*Adisseo Manufacturing, Inc., and*
*Adisseo USA, Inc.*

Norman T. Daniels, Jr., Esq. #937
P. O. Box 1433
Charleston, WV 25325
Tel: 304-342-6666
*Counsel for West Virginia Paving, Inc.*

/s/William V. DePaulo
William V. DePaulo